IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
AT LAFAYETTE

– – – – – – – – – – – – – – – – – – – – — – – – – – – – – X
   :
   :
   :  Civil Action No:  09-CV-1565
JANE DOE, individually and as next friend to her  :
minor daughters, JOAN DOE, JILL DOE and JEN  :  ECF Case
DOE, and JANE WASHINGTON, individually and as  :
next friend to her minor sons, JOHN WASHINGTON,  :  Honorable C. Michael Hill
JAMES WASHINGTON and JOE WASHINGTON,  :
   :
   :
   Plaintiffs,  :
   :
   :
v.  :
   :
   :
VERMILION PARISH SCHOOL BOARD,  :
RANDY SCHEXNAYDER, Superintendent,  :
and DAVID DUPUIS, Principal, RRMS,  :
   :
   Defendants.  :
   :
   :
   :
   :
– – – – – – – – – – – – – – – – – – – – — – – – – – – – – X

## FIRST AMENDED COMPLAINT

1.      This is an action under the Fourteenth Amendment's Equal

Protection Clause (pursuant to 42 U.S.C. § 1983), Title IX of the Education Amendments

of 1972 ("Title IX") and the Title IX implementing regulations of the United States

Departments of Education ("ED"), Health and Human Services ("HHS"), Agriculture

("USDA") and Homeland Security ("DHS") challenging unlawful sex discrimination at the

Rene A. Rost Middle School ("RRMS") in Kaplan, Louisiana.

2.      The Plaintiffs are former, present and future RRMS students acting

by and through their parents, as well as their parents in their individual capacities.

Plaintiffs They bring this action because the Defendants, from 2008 through 2011,

unlawfully have segregated girls and boys attending RRMS, and, upon information and belief, intend to continue to do so in future school years.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action raises federal questions and seeks to redress the deprivation of rights under Title IX, 20 U.S.C. §§ 1681–1688, and the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

4.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims took place in this district and because some of the Defendants reside in this district.

5.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.  A declaration of the law is necessary and appropriate to determine the parties' respective rights and duties.

## PARTIES

6.      Plaintiff JANE DOE is a Resident of Kaplan, Louisiana.  Doe is the mother of five children who have attended, currently attend, or will in the future attend RRMS.  Plaintiff Jane Doe will have at least one child attending RRMS until 2019.  As a result of the sex segregation policies implemented at RRMS, two of her daughters have already been discriminated against on the basis of sex and have been denied educational opportunities, in violation of the law.  Based on the Vermilion Parish School Board's ("VPSB") past actions and its members' stated intention to resume sex segregation in the future, Doe expects that two of her younger children who will attend RRMS in the future will face discrimination on the basis of sex and the denial of educational opportunities, in violation of the law, unless the sex segregation policy at RRMS are permanently enjoined.

2

Jane Doe has no intention of moving to another home outside of Kaplan, Louisiana prior to all of her children graduating from RRMS.

       7.      Plaintiff JOAN DOE is a minor child who attended grades five through eight at RRMS from 2006-2010.  Because she is a minor, Joan Doe appears through her mother, Jane Doe.

       8.      Plaintiff JILL DOE is a minor child who will enter grade eight at RRMS for the 2011-2012 school year and attended RRMS for grades five through seven from 2008-2011.  Because she is a minor, Jill Doe appears through her mother, Jane Doe.

       9.      Plaintiff JEN DOE is a minor child who will enter grade five at RRMS during the 2012-2013 school year.  Because she is a minor, Jen Doe appears through her mother, Jane Doe.

       10.      Plaintiff JANE WASHINGTON is a resident of Kaplan, Louisiana, and the mother of six children who attended, currently attend and will attend RRMS.  As a result of the sex segregation policies implemented at RRMS, three of her sons have been discriminated against on the basis of sex, and have been denied educational opportunities, in violation of the law.  Plaintiff Jane Washington will have at least two children attending RRMS until 2013 and faces the prospect that, unless the sex segregation policy at RRMS is permanently enjoined, her children will be subject to discrimination on the basis of sex and be denied educational opportunities, in violation of the law.  Jane Washington has no intention of moving to another home outside of Kaplan, Louisiana prior to all of her children graduating from RRMS.

       11.      Plaintiff JOHN WASHINGTON, Plaintiff herein, is a minor child who graduated from RRMS in 2010 after attending grades five through eight at the school

from 2005-2010.  Because he is a minor, John Washington appears through his mother, Jane Washington.

12.     Plaintiff JAMES WASHINGTON is a minor child who will attend grades seven and eight at RRMS in the 2011-2012 and 2012-2013 school years, respectively, and attended RRMS for grades five and six from 2009-2011.  Because he is a minor, James Washington appears through his mother, Jane Washington.

13.     Plaintiff JOE WASHINGTON is a minor child who will attend grades seven and eight at RRMS in the 2011-2012 and 2012-2013 school years, respectively, and attended RRMS from 2008-2011.  Because he is a minor, Joe Washington appears through his mother, Jane Washington.

14.     VERMILION PARISH SCHOOL BOARD ("VPSB") is the entity responsible for the administration of schools within Vermilion Parish, including RRMS, the school which VPSB has designated as the middle school for the Doe and Washington families based on the location of their homes.  At all relevant times, VPSB has overseen and approved the implementation of sex segregated classes at RRMS.  VPSB is a political entity capable of suing and being sued.

15.     RANDY SCHEXNAYDER is Superintendent of the Vermilion Parish School Board.  Defendant Schexnayder is responsible for administration of all schools within the Vermilion Parish School District, including RRMS.  At all relevant times, Defendant Schexnayder has overseen and approved the implementation of sex segregated classes at RRMS.  He is sued in his individual capacity.

16.     DAVID DUPUIS is the Principal of RRMS.  He reports directly to Superintendent Schexnayder.  At all relevant times, Defendant Dupuis has directly

4

overseen and implemented sex segregated classes at RRMS.  He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

17.     RRMS is the only public middle school in Kaplan, Louisiana.

18.     Prior to the 2008-2009 academic year, RRMS was a successful coeducational school, recognized by the State of Louisiana as a school of "Academic Growth" and "Exemplary Academic Growth" for meeting and exceeding targets based on standardized test scores, attendance and drop out rates.

19.     Principal David Dupuis has a long-held personal affinity for sex-segregated education.  During the 2007-2008 school year, Dupuis, without the consent of parents, began segregating all RRMS students by sex during non-instructional periods, such as lunch, recess, before school, and in the after-school bus lines.

### A.     The Dupuis Experiment and Dissertation

20.     In the 2008-2009 academic year, Principal Dupuis conducted a sex-segregation experiment at RRMS (the "Dupuis Experiment" or "Experiment").  The Experiment was conducted in connection with his dissertation in the Doctor of Education program at Nova Southeastern University.

21.     The Dupuis Experiment was authorized by VPSB.

22.     Dupuis was aware that experiments on human subjects who were minors required the consent of their parents.  He drafted consent forms, but neither sent the consent forms nor obtained parental consent for the Experiment.  He did, however, provide to his doctoral program the blank consent form.

23.     The Dupuis Experiment purported to consist of assigning all 2008-2009 eighth grade students to coeducational classes for the first two six-week periods of the

school year (Blocks I and II), switching some of those students to sex-segregated classes for Math and English for the second two six-week periods (Blocks III and IV), and returning the students to coeducational classes for the final two six-week periods of the school year (Blocks V and VI).  In fact, 20% of the eighth grade students remained in coeducational classes during Blocks III and IV.

24.     Dupuis provided the eighth grade Math and English teachers with materials authored by sex-segregation proponents including Leonard Sax and Michael Gurian.  The work of both authors is replete with generalizations about the different learning styles, behaviors, and capacities of boys and girls.  These materials recommend different standards of behavior and teaching methods for boys and girls.  Dupuis did not provide the eighth grade Math and English teachers with any literature critical of single-sex education.

25.     Dupuis claimed to monitor the grades and disciplinary referrals of the students during 30 weeks of that time, using grades he claimed were obtained from teachers.

26.     To calculate results, Dupuis created his own GPA scale – different from that listed on RRMS report cards.  After calculating the Experiment results, Dupuis then destroyed the underlying data.

27.     Dupuis based his dissertation on the purported results of his Experiment.  Dupuis' dissertation relies on numerous sex stereotypes, such as:

> (a) "[m]ales learn best in kinesthetic activities, and females may be content to simply observe";

> (b) "[b]oys and girls have some different learning styles";

(c) "[b]oys tend to compete in class, quickly raising their hands or

even blurting out answers; girls more often work well learning

in small groups with other students";

(d) "[f]emales have more acute hearing than do males";

(e) "[m]ales are better able to remember visual cues; females are better

able to remember placement of objects and words";

(f) "[m]en deal with stress through 'fight-or-flight,' women through

'tend-and-befriend'"; and

(g) "[b]oys are more likely to enjoy argument and lively classroom

debate."

28.     Dupuis presented the purported results of the Experiment to the

VPSB on June 4, 2009.  He highlighted higher GPAs and lower discipline referrals across

gender and racial lines during the sex-segregated period, and swings in the opposite

direction once the students returned to coeducational classes.

29.     Dupuis did not discuss with the VPSB – or make reference to –

any literature critical of sex-segregated education, including studies concluding that sex

segregation tends to reinforce gender stereotypes and can lead to grade declines and/or

disciplinary problems, although he was aware of these studies.

30.     Based on the purported results of his Experiment, Dupuis

recommended that the VPSB implement sex-segregated classes with gender-specific

curricula for all core classes.

31.     The data that Dupuis presented to the VPSB, however, were

inaccurate and false in almost all respects.  For example, he reported no failing grades in

Math or English during the sex-segregated phase, even though the official RRMS report cards show 36 Fs in Math and English over the same period.

32.     Although Dupuis reported increases in GPAs during sex segregation, the school report cards show a statistically-significant decline in GPAs during sex segregation.  Other defects in Dupuis' methods and results range from errors in the mathematics required for computing averages to the absence of any controls or independent evaluators to account for intended or unintended bias.

33.     Dupuis also reported to the VPSB that the sex-segregated classes reduced disciplinary infractions by over fifty percent.  His results do not match the infractions reported on the report cards.  For example, Dupuis' data included infractions occurring in Math and English classes on Saturdays, even though no classes are conducted on Saturdays.

34.     Dupuis has admitted, under oath, that his data showed sex segregation had no positive effect on discipline incidents.

35.     Dupuis represented to parents, VPSB, and in his dissertation, that all students had been separated by sex during the Experiment.  However, approximately 20% of the eighth grade students had not been separated by sex during Blocks III and IV of the Experiment.  Nonetheless, the grades and disciplinary incidents for those students were included in Dupuis' data as if they had been separated by sex.

36.     Based on Dupuis' report of the Experiment's results, however, VPSB authorized sex segregation in all parish middle schools starting with the 2009-2010 academic year.  At least one VPSB member suggested making sex segregation compulsory for all VPSB middle schools.

37.     The Dupuis Experiment was the sole basis for implementing sex segregation at RRMS.

38.     RRMS developed a plan to segregate its students by sex and implemented that plan beginning with the 2009-2010 school year.

**B.     2009-2010 Academic Year**

39.     At the beginning of the 2009-2010 school year, Dupuis and Guidance Counselor Ann Abshire divided the approximately 100 students in each grade into two "all boys" and two "all girls" classes in each of RRMS' five core curriculum subjects.  They created a total of 80 sex-segregated classes.

40.     Dupuis and Abshire also created a fifth "special needs" class in each grade, to which they assigned students with Individual Educational Plans ("IEPs") requiring the presence of a resource teacher due to learning disabilities, emotional disturbance, limited English proficiency or other special needs, as well as students who were repeating a grade, seventh and eighth grade GED students, and certain students needing remedial instruction.

41.     No talented or gifted or any other students were placed by Dupuis and Abshire in the coeducational classes prior to the start of the 2009-2010 school year.

42.     In addition, the coeducational classes had a disproportionate number of boys.

43.     Parents were not initially given a choice of whether their children would be in sex-segregated classes or coeducational classes.  Rather, students were assigned to either the single-sex classes or the coeducational classes based on the scheduling plan Dupuis and Abshire had devised.

44.     RRMS held a parent orientation on August 4, 2009, at which Dupuis presented the results of his Experiment to the parents and endorsed sex segregation. Dupuis told the parents that his Experiment had yielded beneficial results.  Dupuis did not mention any potential disadvantages of sex segregation.  Dupuis informed parents about the scheduled sex-segregated classes, but did not give parents a choice of which classes their children would attend.

45.     On August 12, 2009, the ACLU of Louisiana, in response to a request for legal assistance from Plaintiff Jane Doe, wrote to Principal Dupuis and Superintendent Schexnayder to advise them of the illegality of the sex segregation.  The next day, Defendants, through their counsel, conceded that assignment to sex-segregated classes had not been voluntary, but represented that consent letters would be sent to parents on the first day of school.

46.     The 2009-2010 school year commenced on August 17, 2009 with four out of five classes in each grade segregated by sex for all five core curriculum subjects, and all students segregated by sex during non-instructional periods.

47.     The consent forms were not provided to parents until August 21, 2009, after the school year had begun and students had reported to their assigned classes. The consent forms contained no additional information to assist parents in their selections. They were distributed to students to bring home to their parents.

48.     Upon information and belief, the initial assignment of students to single-sex or coeducational classes without parents' knowledge or permission led to students being reluctant to switch out of the classes to which they had already been assigned.  Upon information and belief, in particular, it became known to the students that

the coeducational classes were intended for students with learning disabilities, and consequently students without such disabilities were reluctant to join those classes.

49.     On September 1, 2009, before many of the consent forms had been returned, Dupuis once again presented the purported results of his Experiment and the benefits of sex segregation to RRMS parents at an open house.

50.     Jane Doe signed the consent forms for Joan Doe and Jill Doe, opting that both of her daughters be placed in coeducational classes.  Jane Doe sent the consent forms back to RRMS with her daughters.

51.     Jane Washington similarly signed the consent forms for John Washington, James Washington, and Joe Washington, opting that they be placed in coeducational classes, and returned the forms to RRMS.

52.     Once the consent forms were returned, nearly one-third of the parents elected coeducational classes.

53.     In order to preserve the original structure of the program, Dupuis approached at least 30 parents and students who had chosen coeducational classes to dissuade them from transferring from the sex-segregated classes.  Dupuis did not approach any parent or student who elected sex-segregated classes to encourage them to switch to coeducational classes.

54.     Dupuis personally approached Joan Doe at school and asked to talk with her mother about placing her in coed classes.

55.     Dupuis personally approached Jill Doe at school and initially told her that she was "too smart" to be in the coeducational class.  Jill had originally been told

11

that the coeducational class was full, but then was switched into it on the same day this suit was instituted.

56.     Dupuis called Jane Washington and asked why she had selected the coeducational classes.

57.     Jane Washington's two fifth grade sons were initially placed in the same coeducational class in accordance with her wishes.  After the school year had begun, she was called to meetings with teachers and administrators, including Principal Dupuis and the Vice Principal, and told that being in the same class was causing her sons to distract one another.  Because both of her sons were in fifth grade and there was only one coeducational class in each grade, and the teachers and administrators had told her that this was what was best for her son, Jane Washington felt pressured to move Joe Washington to a sex-segregated class to prevent further problems between her sons.

58.     Principal Dupuis told Jane Washington that it was a good decision to move Joe Washington because the sex-segregated class was a "better class," and Joe Washington would be "pushed harder."

59.     Dupuis also disregarded certain parents' selections on the consent forms, including Jane Doe's election that her daughter Joan be placed in a coeducational class.  Following the return of Doe's consent forms, Joan Doe continued to be assigned to the single-sex class against her mother's wishes until it became impracticable for her to transfer out.

60.     Dupuis also disregarded requests from parents of students with IEPs to be in the single-sex classes.  As a result, all of the "gifted or talented" students at

RRMS remained in the single-sex classes, while almost all of the students with special needs IEPs remained in the coeducational classes.

61.     For example, Jill Doe, who does not have a special needs IEP, was in a class during the 2009-2010 school year that included a disparate number of IEP students and none who was talented or gifted.

62.     The selection of talented and gifted students for single-sex classes and the exclusion of those students with special needs led to inequalities between the single-sex and coeducational classes.

63.     Unlike the single-sex classes, because of the IEP students, the coeducational classes included additional support teachers or aides who at times created classroom distractions by circulating around the room, breaking off groups of students, reading tests aloud, and making other accommodations required by IEPs due to learning disabilities, emotional disturbance, limited English proficiency or other "special needs."

64.     The coeducational classes contained a high concentration of students who lagged behind their sex-segregated counterparts academically and frequently misbehaved.

65.     Coeducational classes had few girls and were disproportionately composed of boys.

66.     Differentiated teaching strategies, materials, and curricula were also used in the all-boys' and all-girls' classes during the course of the program.

67.     RRMS teachers gave different assignments and tests to the all-girls' and the all-boys' classes.  On one occasion, the all-girls' class was given a quiz concerning "bracelets" while the all-boys' class was given a quiz concerning "bikes."

68.     On another occasion, the all-boys' classes were assigned *Where the Red Fern Grows* while the all-girls' classes were assigned *The Witch of Blackbird Pond*, because of the teacher's belief that boys like "hunting" and "dogs," but girls prefer "love stories."  Teachers admitted to using "different strategies" based on their beliefs about what kind of instruction is suitable for girls as compared with boys, such as the belief that girls prefer "a more quiet environment" and with them a teacher would use "a lot more conversation, story telling, personal issues to get her topics across."

69.     Defendants have sanctioned the employment of different teaching strategies for boys and girls based solely upon their sex.

70.     A preliminary injunction hearing in this matter was held on February 24 and 25, 2010.

71.     The District Court issued a ruling stating that the Dupuis Experiment, the sole basis for implementation of the program, was "extremely flawed."

72.     The Court, nonetheless, denied the preliminary injunction and allowed RRMS' sex segregation to continue, subject to some changes in its implementation.

**C.     2010-2011 Academic Year**

73.     RRMS continued segregating a substantial number of the students by sex for core curriculum classes during the 2010-2011 school year.

74.     The 2010-2011 academic year's sex segregation program was a continuation of the 2009-2010 sex segregation program at RRMS.  No new justification was offered for the continuation of the sex segregation.  The Dupuis Experiment continued to be the sole justification for the program.

75.     Parents were not informed of the flaws in the Dupuis Experiment prior to being given a choice between the single-sex or coeducational classes.

14

76.     At a meeting for parents, Dupuis once again presented information about the supposed benefits of sex segregation that downplayed or dismissed opposing views.  The same information was sent home to parents in a brochure along with their election forms.

77.     Plaintiffs Jane Doe and Jane Washington chose for all of their children attending RRMS to be in coeducational classes.

78.     Students were again assigned to either sex-segregated or coeducational classes.

79.     Upon information and belief, the quality of education in the coeducational classes was inferior to that in the sex-segregated classes.

80.     Upon information and belief, the coeducational classes contained a disproportionate number of boys.

81.     Upon information and belief, the coeducational classes contained a disproportionate number of students with special needs IEPs.  Upon information and belief, the single-sex classes contained a disproportionate number of students who were designated "Gifted" or "Talented."

82.     Upon information and belief, the quality of education in the coeducational classes was inferior to what it would have been if RRMS did not segregate the rest of the students by sex.

83.     Upon information and belief, the Defendants continue to structure their sex segregation program in accordance with the view that boys and girls learn and develop differently, and require different teaching methods.

**D.      2011-2012 and Future Academic Years**

84.      Upon information and belief, RRMS fully intended to continue its sex segregation practice for the 2011-2012 school year.

85.      In April 2011, RRMS sent consent forms to parents to select sex-segregated or coeducational classes.  Principal Dupuis hosted meetings in May 2011 to explain the sex-segregated classes.  He once again gave parents information regarding the pros and cons of sex segregation without informing them of the flaws in the Dupuis Experiment.

86.      Upon information and belief, Principal Dupuis told the parents that, pursuant to the District Court's order, they had the right to send their children to other public schools in Vermilion Parish that did not conduct single-sex classes, but parents would have to provide transportation to those schools themselves.

87.      Upon information and belief, Principal Dupuis provided parents with an analysis of a response to a survey of students and teachers ("student/teacher satisfaction survey") that purported to show a high level of satisfaction with the sex segregated classes.  Upon information and belief, students who had elected coeducational classes were not asked to fill out the survey.  Upon information and belief, the survey design was flawed and its findings unreliable.

88.      After the consent forms were returned, an insufficient number of parents in the fifth and eighth grades had elected to enroll their children in the sex segregated classes, resulting in a projected imbalance in the class size between the coeducational and single sex classes in those grades.

89.      Upon information and belief, at a meeting of the VPSB on June 2, 2011, Dupuis presented to school board members a PowerPoint presentation including the

findings of the student/teacher satisfaction survey he had previously presented to parents, and an analysis of disciplinary incidents and academic results.  Upon information and belief, Dupuis asserted that the sex segregation program had led to good results, and recommended that it be continued.

90.      Upon information and belief, Dupuis' analysis contains many of the same flaws as the data he presented to the school board in 2009.

91.      Upon information and belief, Superintendent Schexnayder also stated that the single sex program had shown success.  Because the number of parents electing single gender classes for fifth and eighth grade students was insufficient to allow balanced class sizes, however, he recommended that all academic classes for the 2011-2012 academic year be coeducational.

92.      Upon information and belief, based on this recommendation, RRMS voted to temporarily suspend the single sex classes for the upcoming 2011-2012 school year.

93.      Upon information and belief, despite the suspension of the program temporarily for the 2011-2012 school year, members of the VPSB expressed the view that they would prefer not to abandon the sex segregated classes, and that they intended to resume the sex-segregated classes at RRMS should a sufficient number of parents elect single-sex classes in future school years.

94.      Upon information and belief, Defendants intend to segregate classes by sex at RRMS in the 2012-2013 school year and future academic years.

95.      Upon information and belief, the manner in which Defendants intend to sex segregate classes at RRMS in the 2012-2013 school year and future academic

years will continue to be unlawful and violate the Fourteenth Amendment's Equal

Protection Clause, Title IX and the Title IX implementing regulations of ED, HHS, USDA

and DHS.

      **E.**      **The Harms of Sex Segregated Classes**

      96.      Not all girls are alike.  Research demonstrates that the

psychological differences between individual girls are far larger than any average

psychological differences between girls and boys.

      97.      Not all boys are alike.  Research demonstrates that the

psychological differences between individual boys are far larger than any average

psychological differences between boys and girls.

      98.      Gender is an imprecise proxy for psychological, emotional and

developmental differences in adolescents.  Psychological research demonstrates that on

average, boys and girls are psychologically more alike than different.

      99.      There are no conclusive data that show improved academic

performance resulting from sex segregation.

      100.      Plaintiffs are threatened with concrete and irreparable injury as a

result of Defendants' illegal conduct.  For example, Plaintiffs are subjected to increased sex

role stereotyping, resulting in anxiety that impairs functioning on standardized aptitude

tests and leads young adolescent girls and women to devalue mathematics as a career

choice.  Sex segregation also threatens increased bullying for children who do not fit

typical gender stereotypes.

      101.      Monetary damages cannot remedy the irreparable injury suffered

by Plaintiffs.

102.     Defendants' discriminatory policies and practices threaten harm to the dignity interests of Plaintiffs.

103.     Defendants' discriminatory policies and practices have deprived and continue to threaten to deprive Plaintiffs of unique educational opportunities – including the benefits of a fully coeducational school, of a school free of stereotypes about the way boys and girls learn and behave, and of a more balanced number of girls and boys in a classroom setting.  These policies and practices have also deprived and threaten to continue to deprive Plaintiffs of the unique educational experiences and opportunities afforded in the single-sex classes from which they are excluded on the basis of their sex.

**F.     Federal Funding**

104.     Vermilion Parish School District and RRMS receive federal funding and are subject to the requirements of Title IX.

105.     The federal funding received by Vermilion Parish School District includes funding from the United States Departments of Education ("ED"), Health and Human Services ("HHS"), Agriculture ("USDA") and Homeland Security ("DHS")..

106.     The Vermilion Parish School District and RRMS are, therefore, subject to the Title IX regulations promulgated by the ED, HHS, USDA and DHS.  VPSB has specifically agreed to comply with those regulations.

**G.     Defendants' Conduct**

107.     Defendants have acted and engaged in conduct as set forth in paragraphs 1 through 106 above intentionally, willfully, and in disregard of the rights of Plaintiffs.

108.     Defendants have acted and engaged in conduct as set forth in paragraphs 1 through 106 above with actual notice of and deliberate indifference to the rights of Plaintiffs.

109.     Defendants have acted and engaged in conduct as set forth in paragraphs 1 through 106 above with actual malice.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:  Equal Protection, against VPSB and Defendants Dupuis and Schexnayder in their Individual Capacities

110.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 109 above.

111.     By segregating classes by sex, Defendants have intentionally classified, and, upon information and belief, will continue to classify, Plaintiffs on the basis of their sex and thereby discriminating against and amongst them on the basis of sex in violation of Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION:  Title IX, against VPSB

112.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 111 above.

113.     By instituting sex-segregated classes at RRMS, Defendant VPSB (i) has excluded, and, upon information and belief, will continue to exclude, Plaintiffs from educational programs and activities on the basis of their sex, (ii) has denied, and, upon information and belief, will continue to deny, Plaintiffs the benefits of educational programs and activities on the basis of their sex; and (iii) has subjected, and, upon

information and belief, will continue to subject, Plaintiffs to discrimination on the basis of their sex, in violation of Title IX, 20 U.S.C. §1681(a).

### THIRD CAUSE OF ACTION:  HHS Title IX Regulations, against VPSB

114.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 113 above.

115.    By providing classes separately at RRMS on the basis of sex, requiring or refusing student participation in classes on the basis of the students' sex, and subjecting Plaintiffs to discrimination on the basis of their sex, Defendant VPSB has violated, and, upon information and belief, will continue to violate, the Title IX implementing regulations of the United States Department of Health and Human Services ("HHS"), 45 C.F.R. §§86.31, 86.34.

### FOURTH CAUSE OF ACTION:  USDA Title IX Regulations, against VPSB

116.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 115 above.

117.    By providing classes separately at RRMS on the basis of sex, requiring or refusing student participation in classes on the basis of the students' sex, and subjecting Plaintiffs to discrimination on the basis of their sex, Defendant VPSB has violated, and, upon information and belief, will continue to violate, the Title IX implementing regulations of the United States Department of Agriculture ("USDA"), 7 C.F.R. §§15a.31, 15a.34.

**FIFTH CAUSE OF ACTION:  DHS Title IX Regulations, against VPSB**

118.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 117 above.

119.    By providing classes separately at RRMS on the basis of sex, requiring or refusing student participation in classes on the basis of the students' sex, and subjecting Plaintiffs to discrimination on the basis of their sex, Defendant VPSB has violated, and, upon information and belief, will continue to violate, the Title IX implementing regulations of the United States Department of Homeland Security ("DHS"), 6 C.F.R. §§ 17.400, 17.415(a).

**SIXTH CAUSE OF ACTION:  ED Title IX Regulations, against VPSB**

120.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 119 above.

121.    United States Department of Education ("ED") regulation 34 C.F.R. §106.6 provides that the ED Title IX regulations do not supersede the Title IX regulations of HHS, DHS and USDA.

122.    By providing classes separately at RRMS on the basis of sex, requiring or refusing student participation in classes on the basis of the students' sex, and subjecting Plaintiffs to discrimination on the basis of their sex, Defendant VPSB has violated, and upon information and belief, will continue to violate, 34 C.F.R. § 106.34(a).

123.    By providing different educational aid, benefits, or services on the basis of sex and/or providing aid, benefits, or services in a different manner on the basis of sex, Defendant VPSB has violated, and, upon information and belief, will continue to violate, 34 C.F.R. § 106.31(b)(2).

124.    By denying educational aid, benefits, or services on the basis of sex, Defendant VPSB has violated, and, upon information and belief, will continue to violate, 34 C.F.R. § 106.31(b)(3).

125.    VPSB has not implemented, and, upon information and belief, will not in the future implement, sex segregation at RRMS in a manner consistent with the requirements of 34 C.F.R. § 106.34(b).

126.    By failing to ensure that enrollment in any sex-segregated course at RRMS is substantially related to either of two important objectives specified by the U.S. Department of Education's regulations, Defendant VPSB has violated, and, upon information and belief, will continue to violate, the requirements of 34 C.F.R. § 106.34(b)(1)(i).

127.    By failing to ensure that enrollment in any sex-segregated course at RRMS is completely voluntary, Defendant VPSB has violated, and, upon information and belief, will continue to violate, 34 C.F.R. § 106.34(b)(1)(iii).

128.    By failing to provide all students, including students of the excluded sex, substantially equal coeducational classes in the same subjects as the sex-segregated classes, Defendant VPSB has violated, and, upon information and belief, will continue to violate, 34 C.F.R. § 106.34(b)(1)(iv).

129.    To the extent that ED regulation 34 C.F.R. § 106.34(b) may permit classes to be segregated on the basis of sex outside of the statutory exceptions specified under Title IX, it is contrary to the text of the statute and consequently unauthorized by law, is an unreasonable interpretation of Title IX, and is arbitrary and capricious and not entitled to deference.

130.    To the extent that ED regulation 34 C.F.R. § 106.34(b) may permit classes to be segregated on the basis of sex under circumstances inconsistent with the requirements of the Fourteenth Amendment to the Constitution, it is unconstitutional.

### **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

(a) Permanently enjoin all Defendants from segregating any class or educational program by sex;

(b) Permanently enjoin all Defendants, their agents and employees, and all persons acting in concert or participation with them, including any successors and assigns, to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described in this complaint and to prevent similar future occurrences;

(c) Declare that the actions of Defendants violate Plaintiffs' rights under

      (i)      The Fourteenth Amendment to the United States Constitution; and

      (ii)     The Title IX of the Education Amendments of 1972; and

      (iii)    The Regulations of HHS; and

      (iv)    The Regulations of USDA; and

      (v)     The Regulations of DHS; and

      (vi)    The Regulations of ED, or in the alternative, declare that the Regulations of ED are unauthorized, unreasonable, and/or arbitrary and capricious, and therefore not entitled to deference;

(d) Award Plaintiffs monetary and nominal damages to fairly and reasonably compensate Plaintiffs for any deprivation of their rights;

(e) Award Plaintiffs their expenses, costs, and reasonable attorneys' fees

under 42 U.S.C. § 1988 and any other applicable provision of law; and

(f) Award other equitable and monetary relief as the Court deems just and

proper.

Dated:  July 21, 2011                    Respectfully Submitted,


/s/ Ronald L. Wilson
Ronald L. Wilson (#13575)
900 Poydras Street
Suite 2556
New Orleans, Louisiana 70112
(504) 525-4361
*Cooperating Attorney for the American Civil*
*Liberties Union Foundation of Louisiana*


Lenora M. Lapidus
Galen Sherwin
Amy L. Katz
American Civil Liberties Union Foundation
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2615
*(Admitted pro hac vice)*


Mark W. Friedman
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*(Admitted pro hac vice)*